# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

STEPHEN A. MATHEWS,

    Plaintiff,

    v.

AMERICAN PSYCHOLOGICAL
SOCIETY,

    Defendant.

Civil Action No. 04–261 (CKK)

## MEMORANDUM OPINION
(July 27, 2006)

Plaintiff, Stephen A. Matthews ("Plaintiff"), filed a complaint against Defendant,

American Psychological Society ("Defendant" or "APS") alleging violations of Title VII of the

Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"), the Age Discrimination in

Employment Act, 29 U.S.C. §§ 621–634 *et seq.* ("ADEA"), and the Americans with Disabilities

Act, 42 U.S.C. § 12101 ("ADA").[1]  The Complaint also alleged counts of Hostile Work

Environment under Title VII and Intentional Infliction of Emotional Distress.  On March 7, 2005,

the Court granted Defendant's Motion to Dismiss with respect to the Intentional Infliction of

Emotional Distress claim and granted Defendant's motion for summary judgment with respect to

---

[1]    Although Plaintiff stated in his Complaint that this Court has jurisdiction pursuant to the ADA, in addition to Title VII and the ADEA, Plaintiff did not allege a separate count under the ADA.  However, in Defendant's instant [30] Motion for Summary Judgment, Defendant offers undisputed facts and legal argument to refute an ADA discrimination claim, to which Plaintiff responds in his Opposition.  *See* Memorandum of Law and Points of Authority in Support of Defendant's Motion for Summary Judgment ("Def.'s Mem.") at 7–8; Plaintiff's Opposition to Defendant's Motion for Summary Judgment Pursuant to Rule 56 ("Pl.'s Opp'n") ¶¶ 17–20.

the ADEA claim. *See dkt. entry* [10] (Order) and [11] (Memorandum Opinion). The Court

denied Defendant's original dispositive motion with respect to the remaining counts:

employment discrimination under Title VII and ADA, and Hostile Work Environment under

Title VII. *Id.* Currently pending before the Court is Defendant's [30] Motion for Summary

Judgment on these remaining claims.

## I: BACKGROUND

The Court begins its discussion of the facts by noting that this Court strictly adheres to

the text of Local Civil Rule 7(h) (identical to Local Civil Rule 56.1). As such, in resolving the

instant summary judgment motion, this Court "assumes that facts identified by the moving party

in the statement of material facts are admitted, unless such a fact is controverted in the statement

of genuine issues filed in opposition to the motion." D.C. Civil Local Rule 7(h). The Court also

cites directly to the record, where appropriate, to provide additional information not covered in

either of the parties' statements.

On November 29, 2005, Defendant filed its Memorandum of Law and Points of Authority

in Support of its Motion for Summary Judgment ("Defendant's Memorandum") accompanied by

Defendant's Statement of Undisputed Material Facts ("Defendant's Statement of Facts").

Plaintiff filed his Opposition on December 20, 2005, accompanied by Plaintiff's Statement of

Disputed Facts ("Plaintiff's Statement of Facts"). Contrary to Local Rule 7(h), Plaintiff's

Statement of Facts is not a "separate concise statement of genuine issues setting forth all material

facts as to which it is contended there exists a genuine issue necessary to be litigated." *Id*.

Rather than admitting, denying, or denying–in–part/admitting–in–part each statement set out by

Defendant in corresponding numbered paragraphs and supporting each response through citations

2

to the record, as required by Local Civil Rule 7(h), Plaintiff sets out his "disputed facts" but does not respond to the factual allegations set out in specific paragraphs in Defendant's Statement of Facts. Many of Plaintiff's "disputed facts" are legal conclusions, such as "[t]he American Psychological Society is an employer within the meaning of both Title VII and the Americans with Disability [sic] Act (ADA)" and "Plaintiff was disable [sic] within the meaning of the ADA." Pl.'s Statement of Facts ¶¶ 1, 6. Such legal conclusions, while proper in Plaintiff's accompanying Opposition, are not properly included in Plaintiff's Statement of Facts. Not once in Plaintiff's Statement of Facts does Plaintiff cite to the record. *See generally* Pl.'s Statement of Facts.

Plaintiff's Opposition to Defendant's Motion for Summary Judgment Pursuant to Rule 56 ("Plaintiff's Opposition") itself is also unhelpful in that Plaintiff frequently makes factual assertions therein but then fails to include any citation to the record, such as in Plaintiff's discussion of Plaintiff's medical history, resulting disability, and the alleged failure of Defendant to make proper accommodations. Pl.'s Opp'n ¶ 17. Additionally, Plaintiff cites to a "second affidavit [of Plaintiff]" in support of assertions he makes regarding the timeliness of filing his Complaint, but Plaintiff failed to include any such affidavit with his Opposition. Pl.'s Opp'n ¶ 14.

The Court finds that Plaintiff's deviation from the mandate of the Local Civil Rule undermines the purpose of the Rule, which is to assist the Court in quickly determining which facts are actually in dispute. *See Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 153 (D.C. Cir. 1996) ("[R]epeatedly blending factual assertions with legal argument, the 'relevant facts' section does not satisfy the purposes of a [Rule 56.1] statement.");

*Robertson v. American Airlines, Inc.*, 239 F. Supp. 2d 5 (D.D.C. 2002) (striking defendant's motion for summary judgment for noncompliance with Local Rule 7 and 56.1 because the statement of material facts not in genuine dispute included no citations to the record and improperly mixed factual allegations with argument); *Learnard v. Inhabitants of the Town of Van Buren*, 182 F. Supp. 2d 115, 119 (D. Me. 2002) (deeming Defendants' facts admitted in part because "many of Plaintiff's statements do not actually controvert the Defendants' fact that they purport to address.").

While the purpose of Rule 56.1 was to place "the burden on the parties and their counsel, who are most familiar with the litigation and the record, to crystallize for the district court the material facts and relevant portions of the record," *Finnegan*, 101 F.3d at 151, the Court shall accept the additional burden placed on it by Plaintiff and shall not – in this instance – strike Plaintiff's Statement of Facts or accept all of Defendant's facts as undisputed. Rather, the Court shall carefully parse the record and both sets of facts when outlining the background of this dispute and cite to the record whenever possible. In doing so, the Court will utilize Plaintiff's interrogatory responses as well as his deposition testimony, although these documents were provided to the Court by Defendant and not Plaintiff. Def.'s Statement of Facts, Ex. A (Pl. Dep.), Ex. B (Pl. Dep.), Ex. D (Pl. Interrog. Answers).

Defendant moves for summary judgment on three procedural grounds: that APS was not an "employer" within the statutory definition of both Title VII and the ADA; that Plaintiff's Complaint was deficient because it failed to set forth dates reflecting compliance with administrative deadlines for filing a discrimination claim with OHR; and that Plaintiff failed to file his Complaint with this Court within the deadline set forth in his Right to Sue letter.

4

Because there are issues in dispute that are material as to whether APS fit within the statutory definition of "employer," the Court shall deny Defendant's motion for summary judgment with respect to this issue.  The Court shall also deny Defendant's motion with respect to Plaintiff's failure to establish compliance with administrative deadlines in his Complaint because Rule 8 of the Federal Rules of Civil Procedure does not require a plaintiff to plead such compliance in a complaint.  However, the Court has concluded that Plaintiff's Complaint was untimely according to the deadline set forth in his Right to Sue letter, and accordingly, the Court shall grant Defendant's motion for summary judgment on this basis.  Additionally, in the alternative, had Plaintiff's Complaint been timely filed, Defendant would still be entitled to summary judgment on the merits of Plaintiff's claims in their entirety.

> A.   *Administrative and Procedural Issues*

Plaintiff, an African–American who states that he has cancer and spinal stenosis, filed a complaint with the District of Columbia Office of Human Rights alleging discrimination under Title VII, ADEA and ADA.  The Notice of Charge of Discrimination is dated February 19, 2003.  Pl.'s Opp'n, Ex. VI (Notice of Charge of Discrimination).  A copy of Plaintiff's Right to Sue letter, dated November 10, 2003, is attached to Plaintiff's February 17, 2004 Complaint.  Compl., Ex. 1 (Right to Sue letter).  The Right to Sue letter stated that the Equal Employment Opportunity Commission ("EEOC") was closing Plaintiff's case and that he had ninety days to file his claims in federal or state court.  *Id.*  While Plaintiff stated during his deposition that he does not "recall receiving this notice in the mail," Def.'s Statement of Facts, Ex. A (Pl. Dep.) at 37:9–38:12, Plaintiff's Opposition states that he "did not receive the [Right to Sue letter] until two weeks from the date that the notice was mailed," Pl.'s Opp'n ¶ 14.  Plaintiff testified that he

understood he needed "to get a letter" to take to an attorney in order for him to pursue his claim when EEOC mediation was unsuccessful.  Def.'s Statement of Facts, Ex. A (Pl. Dep.) at 43:2–14.

Plaintiff's charges of discrimination were against Defendant APS, with whom Plaintiff was employed from February 1, 2002, through October 25, 2002.[2]  Pl.'s Opp'n ¶ 15, Ex. IV (2/1/02 letter from Green to Pl. re: acceptance of APS position), Ex. V (10/11/02 memo from Kraut to Pl. re: APS Termination).  In the year 2001, Defendant employed fifteen full time employees for nine weeks only, and for the remaining 43 weeks, had fourteen or fewer employees.  Def.'s Statement of Facts ¶ 3.  In the year 2002, Defendant asserts that it employed fifteen full time employees for fewer than twenty weeks.  Def's Statement of Facts ¶ 4.  Plaintiff, on the other hand, contends that Defendant "had fifteen employees during the period of Plaintiff's employment."  Pl.'s Statement of Facts ¶ 2; Pl.'s Opp'n, Ex. II–A (Pl. Aff.) ("[D]uring my stay there were at least fifteen employees on a consistent and regular basis").  Plaintiff also offers affidavits of two former employees who also state that APS employed at least fifteen individuals while they worked there.  Pl.'s Opp'n, Ex. III–A (Davis Aff.) ("At the time of my employment, there were at least fifteen or more full time employees), Ex. III–B (Third Givens Aff.) ("When I was employed at APS there were fifteen (15) employees or more.").

---

[2]      In his affidavit included with Plaintiff's Opposition, Plaintiff stated that his employment with APS began November 13, 2001.  Pl.'s Opp'n, Ex. II–A (Pl. Aff.).  However, on November 13, 2001, Plaintiff was hired for a "full time position with a probationary period of three months," and did not become a permanent employee until February 1, 2002.  Def.'s Statement of Facts, Ex. A (Pl. Dep.) at 31:5–9; Pl.'s Opp'n ¶ 15, Ex. IV (2/1/02 letter from Green to Pl. re: acceptance of APS position).

Defendant offers three affidavits by Sarah Brookhart, Deputy Director of APS, whose duties included personnel management, regarding Defendant's number of employees in 2002. *See* Def.'s Mot. to Dismiss, Ex. 1 ("First Brookhart Aff."); Def.'s Statement of Facts, Ex. C ("Second Brookhart Aff."); Def.'s Reply, Ex. 1 ("Third Brookhart Aff.").  The First Brookhart Affidavit has two attachments.  The first, "2002 FTE Employees" (hereinafter "Chart One"), includes a weekly list of each APS employee by name, states hire and departure dates, and contains a tally for how many full time employees APS had per week.  The second chart, "2002 FTE Employees by week" (hereinafter "Chart Two"), only lists the week number and number of full time employees for that week.  Chart One lists seventeen weeks wherein APS had fifteen employees, whereas Chart Two lists twenty–two weeks wherein APS had fifteen employees, though both charts conclude that there were "35 weeks at 14 or under" full time employees.  The discrepancy between the charts was determinative in the Court's denial of Defendant's prior dispositive motion on this issue for the Title VII and ADA claims.  *See dkt. entries* [10] (Order) and [11] (Memorandum Opinion at 9–10).

The Second Brookhart Affidavit attempts to clarify the number of weeks with fifteen or more full time employees in 2001 and 2002.  Def.'s Statement of Facts, Ex. C ("Second Brookhart Aff.").  There, it is asserted that there were sixteen weeks in 2002 during which Defendant had fifteen full time employees.  *Id.* at ¶¶ 8, 10.  This figure is consistent with neither of the two charts Defendant initially provided, which stated there were seventeen and twenty–two weeks of fifteen full time employees.  Def.'s Mot. to Dismiss, Ex. 2 (Chart One), Ex. 3 (Chart Two).

The Third Brookhart Affidavit states that the five weeks that differ between the two full–time employee lists, weeks number 5, 8, 27, 28 and 29, were "erroneously listed as 15 [employees] instead of 14 [employees]" on Chart Two.  Def.'s Reply Ex. 1 (Third Brookhart Aff.) ¶7.  Although the affidavit states that there were only sixteen weeks during which Defendant employed fifteen full time employees, *id.* ¶ 6, the affidavit concurs with Chart One that there were "35 weeks of 14 or under" employees, leaving seventeen weeks of fifteen full time employees, none of which Defendant disputes.  *Id.* ¶ 8; Def.'s Mot. to Dismiss, Ex. 2.  Thus, there is no dispute among the parties that there were at least seventeen weeks in 2002 when Defendant had fifteen full time employees.

For the remaining five disputed weeks, Defendant offers payroll records to clarify the number of employees for the five weeks that differ between Chart One and Chart Two, weeks number 5, 8, 27, 28 and 29.  Def.'s Reply Exs. 2–5 (Payroll records for pay periods: 1/31/02, 2/15/02, 6/30/02, 7/15/02).  The payroll records each have a handwritten note at the top that reads "Pay Period" followed by a date.  *Id.*  Defendant operated on a bimonthly pay schedule.  Def.'s Statement of Facts., Ex. E.  However, nowhere on the payroll records is the range of dates for which employees are being compensated listed.  *See* Def.'s Reply Exs. 2–5 (Payroll records for pay periods: 1/31/02, 2/15/02, 6/30/02, 7/15/02).  Additionally, there is an inconsistency where the payroll records state that an individual who would be a fifteenth employee, Diana, was terminated on June 28, 2002 while Chart One states that Diana was terminated on July 15, 2002.[3] Def.'s Reply Exs. 4, 5 (Payroll records for pay periods: 6/30/02, 7/15/02); Def.'s Mot. to

---

[3]     Diana remained on the payroll despite having been terminated because she was receiving severance pay.  Def.'s Reply, Ex. 5 (Payroll record for pay period: 7/15/02) (stating, "severence paid through 12/31/02).

Dismiss, Ex. 1 (Chart One).  Three calendar weeks are potentially affected by this discrepancy:

the weeks ending July 5, July 12 and July 19, which correspond to weeks 27, 28 and 29 on the

full time employee charts, three of the five weeks Plaintiff contends are in dispute.  *See* Def.'s

Mot. to Dismiss, Ex. 1 (Chart One), Ex. 2 (Chart Two).

> B.        *Plaintiff's Evidence of Race Discrimination*

In support of his Title VII race discrimination claim, Plaintiff asserts a list of actions

taken by Defendant because Plaintiff and other employees were African–American.  Pl.'s Opp'n

¶ 23; Compl. ¶ 9.  Plaintiff asserts that he was reprimanded on two occasions.  Def.'s Statement

of Facts, Ex. D (Pl.'s Interrog. Answers) No. 7.  The first reprimand, in July of 2002, occurred

when an employee "who was leaving at the end of the pay period . . . wanted to know how much

leave she was going to be paid," and Plaintiff advised her "consistent with the Employee

Handbook."  Def.'s Statement of Facts, Ex. D (Pl.'s Interrog. Answers) No. 7.  Brookhart,

Plaintiff's supervisor, told Plaintiff that she "was very concerned that he had not consulted [her]

before informing an employee who was under [her] direct supervision" about this issue.  Def.'s

Statement of Facts, Ex. F–5 (10/24/02 Brookhart Note to File).  The second reprimand occurred

when Plaintiff was conducting an orientation of two newly hired employees, and Brookhart

"barged into [his] office without knocking or excusing herself and demanded in a very hostile

tone of voice that [Plaintiff] keep [his] office door open" during the orientation.  Pl.'s Opp'n, Ex.

II–A (Pl. Aff.).  There was no office policy regarding keeping one's door open.  Def.'s Statement

of Facts, Ex. B (Pl. Dep.) at 140:14–16.

When asked to elaborate on his interrogatory response regarding being asked to perform a

"menial task," Plaintiff's deposition testimony indicates that Brookhart requested that he move

some boxes during an out–of–town convention.  Def.'s Statement of Facts, Ex. B (Pl. Dep.) at

125:15–130:12.  To his knowledge, he was the only employee asked to perform this task.  *Id.* at

129:16–18.  In his Answers to Defendant's First Set of Interrogatories, Plaintiff states that there

were "other younger white males" present who were not asked to perform this task, but nowhere

in his deposition testimony or elsewhere in the record is there specific evidence regarding other

employees present and tasks they were or were not asked to perform.  Def.'s Statement of Facts,

Ex. D (Pl.'s Interrog. Answers) No. 7.  Upon discovering Plaintiff was moving the boxes, the

convention coordinator called a hotel porter to move them instead.  Def.'s Statement of Facts,

Ex. B (Pl. Dep.) at 128:9–17.

Plaintiff recalls an incident when only white employees were invited to attend a hearing

on Capitol Hill where an APS attorney was testifying.  Def.'s Statement of Facts, Ex. B (Pl.

Dep.) at 172:15–175:17.  According to Plaintiff, five or six employees went, some of them

subordinate or junior employees, and there was "no rhyme nor reason … almost like hand picked

and selected" because they were white.  *Id.* at 174:20–175:11.

Plaintiff also alleges that he was "excluded from key hiring decision[s]."  Pl.'s Opp'n ¶

21.  In his deposition, Plaintiff testified that it was not his role to select or interview candidates,

nor to participate in the decision of whether to hire employees.  Def.'s Statement of Facts, Ex. B

(Pl. Dep.) at 137:5–15.  Rather, his grievance is that he was not given information about the

newly hired employees' job descriptions and salaries to properly conduct the Human Resources

orientation, which was one of his duties at APS.  *Id.* at 136:16–139:12.

Plaintiff also recounts two incidents in which he was allegedly forced to "engage in

unethical accounting principles."  Compl. ¶ 9.  The first instance involved a dispute over the

manner in which Plaintiff, as APS's accountant, should account for APS's unrealized losses.

Def.'s Statement of Facts, Ex. D (Pl.'s Interrog. Answers) No. 7.  The procedure Plaintiff wanted

to follow was consistent with the recommendations of APS's auditor, but Kraut, the Executive

Director, insisted that Plaintiff follow a different practice.  Def.'s Statement of Facts, Ex. B (Pl.

Dep.) at 144:16–147:8.  Plaintiff "found it very strange that [he] would be requested not to reflect

what is actually transpiring with the corporate financial affairs on the record" in the documents

that the Board of Directors would examine at their meeting.  *Id.* 148:11–149:5.  In the second

occurrence, Plaintiff handled an insurance matter according to his understanding of proper

accounting practices but contrary to APS's procedure.  Def.'s Statement of Facts, Ex. F–5

(9/16/02 email from Pl. to Brookhart re: Olive Branch).  Plaintiff made this policy decision

without consulting anyone, though he complied with Brookhart's request to return to APS's

procedure when Brookhart signed off on the change.  Def.'s Statement of Facts, Ex. F–5

(10/24/02 Brookhart Note to File).

Plaintiff asserts that white employees were given the opportunity to work from home

without a stated concern over "office security" while Plaintiff's alleged request was denied due to

security concerns.  Pl.'s Opp'n at ¶ 17.  To show that office security was not really a concern,

Plaintiff states that a "white male contractor was allowed to work from his home and access the

office computers" without any record citation or specific information regarding this employee or

when this allegedly occurred.  *Id.*  Plaintiff also states that "[a] white female was allowed to work

from home following the birth of her child," and Plaintiff cites to Brookhart's deposition

testimony in support thereof.  *Id.*  However, the cited excerpt of the transcript makes no mention

of Brookhart working from home, and only refers to her working part-time in 1992.  Pl.'s Opp'n,

Ex. VII (Brookhart Dep.) at 51.

In his Complaint, Plaintiff states that APS gave "Caucasian employees preferential

treatment in promotions and jobs."  Compl. ¶ 9.  Plaintiff does not reiterate this claim in his

Opposition, and there is no record citation providing examples of such discriminatory practices.

*See generally* Pl.'s Opp'n.  In support of his claim that APS employed fifteen or more employees

in 2002, Plaintiff offered an affidavit by Barbara Givens, a former APS employee, and this

affidavit serves as the only basis for Plaintiff's claim that APS discriminated on the basis of race

for hiring and promotions.  Pl.'s Opp'n, Ex. III–B (Third Givens Aff.) at 1.  Although Plaintiff

did not cite this affidavit for any of his arguments except regarding the number of employees at

APS, the affidavit also contained allegations of race discrimination.  Specifically, it stated that

African–American employees did not receive bonuses or acknowledgment for performing their

jobs well, while white employees were often given raises and promotions. *Id.*  Also, Givens

makes the unsubstantiated assertion that "[n]ine Blacks were fired or encouraged to quit within

one year."  Pl.'s Opp'n, Ex. III–B (First Givens Aff.) at 1.

In his response to Defendant's interrogatory regarding Plaintiff's allegations of race

discrimination, Plaintiff states that "[s]ubsequent to the demise of Diana Green, the Deputy

Executive Director of a total staff of fifteen, the following staff have turned in their resignation or

[been] terminated: Director of Meetings and Conventions, the Manager of Membership, the

membership Associate, the membership associate/accounting assistant, the Director of

Accounting and Administration.  The common thread is that the above mentioned individuals are

minority." Def.'s Statement of Facts, Ex. D (Pl.'s Interrog. Answers) No. 7.  He provides no

support in the record to substantiate this allegation, no time frame or context, and does not even name the individuals who were allegedly terminated or resigned.

Plaintiff asserts that he "was addressed and treated in a derogative manner by the Defendant in the presence of the Board of Directors and other employees" but offers no evidence or specific facts with respect to this alleged treatment.  Pl.'s Opp'n ¶ 23.  Plaintiff did not think Kraut or Green, two of his supervisors, had "any issues with [him] because of [his] national origin or skin color" but thought Brookhart "possibly" did because "her actions tend[ed] to give [him] that impression."  Def.'s Statement of Facts, Ex. A (Pl. Dep.) at 102:7–103:4.  Brookhart never made any disparaging comments about him based on his national origin.  Id. at 103:17–104:1.  Plaintiff did recall Brookhart treating minority employees differently than whites and felt she demonstrated a "pattern . . . of indifference . . . to all the black employees," but the only example that came to Plaintiff's mind was when Brookhart made another minority employee put his shoe on despite having a foot injury.  Def.'s Statement of Facts, Ex. A (Pl. Dep) at 103:9–11, Ex. B (Pl. Dep.) at 178:1–180:14.

While Plaintiff asserts that he was considered an exemplary employee until Brookhart took over as Deputy Director, Plaintiff states that he never received any employee evaluations and there are no facts on the record substantiating his assertion that he received favorable feedback.  Pl.'s Opp'n ¶ 23; Def.'s Statement of Facts, Ex. D (Pl.'s Interrog. Answers) No. 15.

On October 9, 2002, Plaintiff received a memorandum ("Separation Agreement") in which Kraut, APS's Executive Director, refers to past discussions about restructuring Plaintiff's position within APS to an "Accountant/Bookkeeper/Office Manager model.  We both agree that your skills would be somewhat wasted under this model. . . ."  Def.'s Statement of Facts, Ex. E

(Separation Agreement).  The agreement provided that Plaintiff would receive compensation for

three final pay periods and stated that "[t]his arrangement is in consideration of your diligence

and hard work on behalf of APS . . . .  In exchange for this, you release APS and all of its officers

and members from any claims of any nature whatever arising out of your employment or the

circumstances of your separation."  *Id.*  Plaintiff stated that the Separation Agreement "was the

first time [he] heard anything" about his position being restructured.  Def.'s Statement of Facts,

Ex. B (Pl. Dep.) at 153:14–155:19.  While Plaintiff's Complaint states that Plaintiff was

demoted, suggesting he understood the Separation Agreement to be a demotion, the terms of the

agreement state that Plaintiff "would continue to be an APS employee . . . through the end of

October" indicating that at that point, his employment with APS would terminate.  Def.'s

Statement of Facts, Ex. E (Separation Agreement).  Thus, Plaintiff's assertion that he was first

demoted seems to reflect a misunderstanding as to the function of the Separation Agreement.

Plaintiff did not sign the agreement, at which point Defendant terminated his employment

immediately, rather than provide Plaintiff with the benefits stated in the terms of the Separation

Agreement.  Pl.'s Opp'n, Ex. V (10/11/02 memo from Kraut to Pl. re: APS Termination).

Although Plaintiff states in his Opposition that, after his termination, APS filled his position with

a white employee, there is no evidence in the record to substantiate this assertion, particularly

given that Plaintiff's position no longer existed upon his termination because it was changed to a

new model.  Pl.'s Opp'n ¶ 22; Def.'s Statement of Facts, Ex. E (Separation Agreement).  Neither

Plaintiff nor Defendant offers evidence as to who, if anyone, took over the accounting duties that

the Separation Agreements indicates were eliminated from Plaintiff's position when it was

restructured from the "Director of Finance model" to the "Accountant/Bookkeeper/Office

Manager mode."

    C.    *Plaintiff's Evidence of Disability Discrimination*

In early October of 2002, Plaintiff states that he told Kraut, APS's Executive Director,

that Plaintiff had been diagnosed with spinal stenosis. Def.'s Statement of Facts, Ex. D (Pl.'s

Interrog. Answers) No. 7. Plaintiff has not asserted nor provided a record regarding the nature of

his disability, nor any communications he had with any APS employee about his condition. *See*

Compl.; Pl.'s Opp'n ¶¶ 17–21; Def.'s Statement of Facts, Ex. D (Pl.'s Interrog. Answers) Nos.

11–12. Plaintiff states that he "was admonished by Sarah Brookhart" when he had APS's

receptionist inform the staff that he "was ill and unable to report to work." Def.'s Statement of

Facts, Ex. D (Pl.'s Interrog. Answers) No. 7. Plaintiff states in his interrogatory responses that,

despite having "recently undergone two serious operations . . . demands were made of [him] to

engage in activities that were inimical to [his] health and wellbeing." *Id.* at No. 8. When asked

to elaborate on the nature of these demands during his deposition, Plaintiff recounted an incident

when Plaintiff's job required him to pull boxes off of shelves to do research. Def.'s Statement of

Facts. Ex. B (Pl. Dep.) at 156:5–157:18. When Plaintiff told his supervisor he could not lift the

boxes, she said to get another employee to do it; when that employee refused, the boxes were not

moved. *Id.*

Plaintiff alleges that he was discriminated against when Defendant failed to make

accommodations for him when he was recovering from cancer surgery. Pl.'s Opp'n ¶ 17.

According to Plaintiff, he "received permission to work at home prior to his surgeries. . . [but]

the new acting director [Brookhart] refused the accommodation under the pretext of office

security." *Id.* Plaintiff has not provided any evidence beyond his own testimony regarding his

alleged prior authorization to work from home. *See* Pl.'s Opp'n ¶¶ 17–21. Also, both of

Plaintiff's asserted examples of other employees being afforded the benefit of working from

home are wholly unsubstantiated. The unnamed "white male contractor" who Plaintiff alleges

was allowed to work from home is not found in the record before the Court. *See* Pl.'s Opp'n ¶

17. Similarly, Plaintiff's assertion that Brookhart was allowed to work from home after the birth

of her child is not substantiated by the record, and the only evidence on this issue is simply her

testimony that she worked part-time in 1992. Pl.'s Opp'n, Ex. VII (Brookhart Dep.) at 51.

Plaintiff, not having received permission to work from home, returned to work "three

weeks earlier than ordered by the doctor. Plaintiff had exhausted his sick leave during the

surgeries and feared losing his job." Pl.'s Opp'n ¶ 17. During his deposition, Plaintiff stated he

received a doctor's note "indicating that [he] can come back to work" which he gave to

Brookhart. Def.'s Statement of Facts, Ex. B (Pl. Dep.) at 159:3–161:4. Defendant did not find

the note in Plaintiff's personnel file, but Plaintiff insists he must have given the note to APS

because APS policy required employees to bring a note before returning to work. *Id.* On

October 9, 2002, Plaintiff received the Separation Agreement, which he did not sign. Pl.'s Opp'n

¶ 21; Def.'s Statement of Facts, Ex. E (Separation Agreement). On Friday, October 11, 2002,

Plaintiff "took a day of sick leave to have the MRI examination," the afternoon of which Kraut

called him, terminating his employment. Def.'s Statement of Facts, Ex. D (Pl.'s Interrog.

Answers) No. 7; Pl.'s Opp'n, Ex. V (10/11/02 memo from Kraut to Pl. re: APS Termination).

      D.     *Defendant's Evidence of Non–Discriminatory Reasons for Plaintiff's Termination*

Plaintiff was hired as Director of Accounting/Administration.  Pl.'s Opp'n ¶ 15, Ex. IV (2/1/02 letter from Green to Pl. re: acceptance of APS position).  Defendant has provided various memoranda and emails relating to errors or deficiencies in Plaintiff's performance of his job.  In a September 19, 2002 memorandum, Alan Kraut, APS's Executive Director, expressed concern over another employee performing several of Plaintiff's job duties, areas which Kraut felt Plaintiff "need[ed] to be responsible for."  Def.'s Statement of Facts, Ex. F–1 (9/19/02 memo from Kraut to Pl. re: For our discussion).  As a result, the balancing of APS's books and other aspects of Plaintiff's accounting duties, were not being performed in a timely or accurate manner. *Id.*  Kraut also expressed his concern that Plaintiff was "less knowledgeable" of the subject matter of his position than he "needed to be."  *Id.*  Kraut also stated that other employees told him they were "unsure that [Plaintiff was] on top of the details of our system," that "seemingly simple requests . . . were met by [Plaintiff] with long delays," and that Plaintiff failed to keep them informed of accounting matters such as flexible spending.  *Id.*  Additionally, Kraut referred to prior discussions between himself and Plaintiff regarding wanting "to see tighter and more timely controls placed on APS operations," and that as the sole member of the accounting office, Plaintiff needed to be "hands–on" in the duties of his position, rather than focusing on his "visions for APS . . . to move to another level of financial sophistication."  *Id.*  These changes were needed towards Plaintiff "restoring [his] credibility" with APS and its employees.  *Id.*

While Plaintiff stated in his deposition that "from [his] perspective" he was providing adequate information to fulfill his duties, he does not specifically refute any of the Kraut memorandum's criticisms.  Def.'s Statement of Facts, Ex. A (Pl. Dep.) at 56:18–57:1.  When asked whether he attempted to comply with Kraut's memorandum, Plaintiff said that "[t]here was

not anything, no specificity in what he told me to do. . . . [T]herefore I [could not] respond to

anything at all." *Id.* at 65:14–20.  Plaintiff also states that he "was an exemplary employee" prior

to Brookhart becoming Deputy director, but Plaintiff provides no evidence of favorable feedback

on his work, beyond his own deposition testimony that states that, though he never received any

performance evaluations, "Alan Kraut and the executive director, Diana Green and also Sarah

Brookhart . . . all said I was doing a fantastic job, a great job.  They were very pleased with what

I was doing."  Def.'s Statement of Facts, Ex. A (Pl. Dep.) at 52:9–53:15.  Plaintiff states that he

was "always complimented on [his] good job performance."  Def.'s Statement of Facts, Ex. D

(Pl.'s Interrog. Answers) No. 15.

Another example Defendant offers of its dissatisfaction with Plaintiff's job performance

is Plaintiff's failure to notify Brookhart when he "closed the books" despite her request that he

do so.  Def.'s Statement of Facts, Ex. A (Pl. Dep.) at 66:5–20, Ex. F–2 (9/17/02 email from

Brookhart to Pl. re: August Books).  In this email, Brookhart noted a "general pattern . . . where

[Plaintiff was] not communicating and consulting appropriately with [Brookhart] and others on

staff."  Def.'s Statement of Facts, Ex. F–2 (9/17/02 email from Brookhart to Pl. re: August

Books).  On September 27, 2002, another employee emailed Plaintiff noting an error in his

medical insurance deduction and asking Plaintiff to correct it.  Def.'s Statement of Facts, Ex. F–3

(9/27/02 email from Sahibzada to Pl. re: error in medical insurance deduction).  In an October 4,

2002 email, the Director of Communications sought to follow–up on an August 15, 2002

memorandum regarding outstanding open invoices because Plaintiff had not responded to or

corrected the issue noted in the previous communication.  Def.'s Statement of Facts Ex. F–4

(10/4/02 email from Weaver to Pl. re: status of open invoices).  Brookhart, who was copied onto

18

the email, reprimanded Plaintiff for his response, which was "not an appropriate answer. . . . It's [Plaintiff's] responsibility to keep track of these kinds of transactions." *Id.*

In an email dated September 16, 2002, Plaintiff sought to clarify a misunderstanding that occurred when Brookhart asked him to perform a certain accounting task according to APS protocol, which was contrary to what Plaintiff stated were "general accepted accounting principles." Def.'s Statement of Facts, Ex. F–5 (9/16/02 email from Pl. to Brookhart re: Olive Branch). According to Brookhart, in following his understanding of the proper procedure, Plaintiff acted "without consulting anyone," making a change that was "a major departure from [APS's] existing practices . . . and [] a policy decision that requires input and approval" from supervisors. Def.'s Statement of Facts, Ex. F–5 (10/24/02 Brookhart Note to File)*.* The Note to File also discusses the July incident in which Plaintiff advised another employee about payment for unused leave without consulting Brookhart. *Id.* Brookhart notes that Plaintiff's "description of that conversation fits with his pattern of distorting facts in order to sidestep an issue." *Id.*

Finally, Defendant notified Plaintiff that the model of his position was being changed to one under which Plaintiff's skills "would be somewhat wasted," and asked him to sign a Separation Agreement providing various terms for the termination of Plaintiff's employment with APS. Def.'s Statement of Facts, Ex. E (Separation Agreement). Plaintiff did not sign the Separation Agreement and was given two weeks notice of his termination on October 11, 2002. Pl.'s Opp'n, Ex. V (10/11/02 memo from Kraut to Pl. re: APS Termination).

## II: LEGAL STANDARDS

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is

entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638

(D.C. Cir. 1994).  Under the summary judgment standard, Defendant, as the moving party, bears

the "initial responsibility of informing the district court of the basis for [its] motion, and

identifying those portions of the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits which [it] believe[s] demonstrate the absence of a

genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Plaintiff, in

response to Defendants' motion, must "go beyond the pleadings and by [his] own affidavits, or

depositions, answers to interrogatories, and admissions on file, 'designate' specific facts showing

that there is a genuine issue for trial." *Id.* at 324 (internal citations omitted).

Although a court should draw all inferences from the supporting records submitted by the

nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar

summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  To be

material, the factual assertion must be capable of affecting the substantive outcome of the

litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a

reasonable trier–of–fact could find for the nonmoving party. *Laningham v. U.S. Navy*, 813 F.2d

1236, 1242–43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at 251 (the court must determine

"whether the evidence presents a sufficient disagreement to require submission to a jury or

whether it is so one–sided that one party must prevail as a matter of law").  "If the evidence is

merely colorable, or is not sufficiently probative, summary judgment may be granted." *Liberty

Lobby*, 477 U.S. at 249–50 (internal citations omitted).  "Mere allegations or denials in the

adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary

judgment." *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996).  The adverse party must

do more than simply "show that there is some metaphysical doubt as to the material facts."

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Instead, while the

movant bears the initial responsibility of identifying those portions of the record that demonstrate

the absence of a genuine issue of material fact, the burden shifts to the non–movant to "come

forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587 (citing

Fed. R. Civ. P. 56(e)) (emphasis in original).

### III: DISCUSSION

As an initial matter, Defendant asks this Court to strike Plaintiff's Opposition as untimely

filed.  Def.'s Reply ¶ 1.  Defendant filed its Motion for Summary Judgment on November 29,

2005, and Plaintiff filed his Opposition December 20, 2005, making Plaintiff's Opposition late

pursuant to the eleven–day deadline provided by the local rules.  D.C. Local Civil Rule 7(b).

Because Plaintiff did not comply with the filing deadline, the Court could grant as unopposed

Defendant's Statement of Facts.  *Id.* ("If such a memorandum is not filed within the prescribed

time, the court may treat the motion as conceded.").  Rather than doing so, however, the Court

will entertain the many procedural and substantive grounds on which Defendant moves for

summary judgment.

    *A.*    *Procedural Issues*

        1.    <u>Defendant is Not Entitled to Summary Judgment on the Issue of Whether APS Was an "Employer" Under Title VII and ADA</u>

Plaintiff and Defendant agree that in order to be subject to suit for discrimination in the

workplace, one must be an "employer" within the statutory definition for both Title VII and

ADA, which both define "employer" as "a person engaged in an industry affecting commerce

who has fifteen or more employees for each working day in each of twenty or more calendar

weeks in the current or preceding calendar year." 42 U.S.C. § 2000e(b) (Title VII); 42 U.S.C. §

12111(5)(A) (ADA). The relevant calendar year is that during which the alleged discrimination

occurred. *Walters v. Metro. Educ. Enter., Inc.*, 519 U.S. 202, 205 n.1 (1997). Plaintiff's time of

employment with Defendant was from February 1, 2002 through October 25, 2002. Pl.'s Opp'n,

Ex. IV (2/1/02 letter from Green to Pl. re: acceptance of APS position), Ex. V (10/11/02 memo

from Kraut to Pl. re: APS Termination). All of the discriminatory acts that Plaintiff alleges

occurred between these dates. *See* Def.'s Statement of Facts, Ex. D (Pl.'s Interrog. Answers) No.

7. While Defendant offers its numbers of employees for both 2001 and 2002, the Court will

focus its discussion on 2002 because there is no dispute among the parties that APS did not have

the requisite number of employees to be an "employer" in 2001.

Plaintiff asserts that there is a material issue of fact in dispute regarding this issue because

there was a discrepancy between Chart One (showing seventeen weeks in 2002 during which

Defendant had fifteen full time employees) and Chart Two (showing twenty–two weeks in 2002

during which Defendant had fifteen full time employees). Pl. Opp'n ¶ 12; Def.'s Mot. to

Dismiss, Ex. 2 (Chart One), Ex. 3 (Chart Two). Plaintiff also provides affidavits of various

employees who assert that during their employment, Defendant had at least fifteen employees.

Pl.'s Opp'n, Ex. II–A (Pl. Aff.), Ex. III–A (Davis Aff.), Ex. III–B (Third Givens Aff.). None of

these affidavits states a specific number of weeks, rather they more generally assert that during

the time of each affiant's employment, and on a "consistent and regular basis," there were fifteen

employees at APS. *Id.*

As discussed above, it is undisputed that there were at least seventeen weeks in 2002 in which Defendant employed fifteen workers.  Def.'s Mot. to Dismiss, Ex. 2 (Chart One), Ex. 3 (Chart Two); Def.'s Statement of Facts, Ex. C (Second Brookhart Affidavit).  The only weeks in dispute are the weeks where Chart One and Chart Two differ: weeks 5, 8, and 27–29.  *Id.*; Pl.'s Opp'n ¶ 12.  Defendant offers payroll records to clarify its employee numbers for these weeks.  Def.'s Reply, Exs. 2–5 (Payroll records for pay periods: 1/31/02, 2/15/02, 6/30/02, 7/15/02).

In *Walters v. Metropolitan Educational Enterprises*, the Supreme Court held that the payroll method is the proper method to determine "the number of employees that the employer 'has' for each working day" for the purposes of Title VII claims because "the employment relationship is most readily demonstrated by the individual's appearance on the employer's payroll."  519 U.S. 202, 206–07 (1997).  Focusing on the employment relationship does not render the statutory language of "for each working day" superfluous because this language clarifies that "an employee who depart[s] in the middle of a calendar week would [not] count toward the 15–employee minimum for that week."  *Id.* at 209; 42 U.S.C. § 2000e(b).

Thus, an employee counts towards an employer's requisite number of employees if he or she appears on the payroll *and* did not depart mid–week.  This interpretation of the statute makes it not only necessary to look at payroll records, but also to know which calendar weeks were covered during each pay period and precisely when any employees departed before the end of a calendar week despite being on the payroll.  While Defendant's marginalia on each payroll state a "Pay Period" date, the records do not establish the range of dates for which employees were being paid.  Def.'s Reply, Exs. 2–5 (Payroll records for pay periods: 1/31/02, 2/15/02, 6/30/02, 7/15/02).  The Court could infer from the fact that Defendant offered these selected records in

response to Plaintiff's issue with weeks 5, 8, and 27–29 that these are the weeks covered by these payroll records.  However, Defendant, as the moving party, bears the burden of showing there is no material issue of fact in dispute, and thus, the impetus was on Defendant to demonstrate how the payroll records clarify the weeks in question.  *Celotex*, 477 U.S. at 323.

Additionally, there is an inconsistency wherein the payroll records indicate that an individual who would be considered a requisite fifteenth employee, Diana, was terminated on June 28, 2002, while Chart One indicates that Diana was terminated on July 15, 2002.  Def.'s Reply Exs. 4, 5 (Payroll records for pay periods: 6/30/02, 7/15/02); Def.'s Mot. to Dismiss, Ex. 2 (Chart One).  Three calendar weeks are affected by this discrepancy: the weeks ending July 5, July 12 and July 19, which correspond to weeks 27, 28 and 29 on the full time employee charts. *See* Def.'s Mot. to Dismiss, Ex. 2 (Chart One), Ex. 3 (Chart Two).  With no further information available as to Diana's actual termination date, this factual issue is in dispute.  It is material because these three weeks, added to the seventeen weeks of full time employees that are not in dispute, would constitute twenty weeks of fifteen full time employees, thus bringing Defendant within the statutory meaning of "employer."  Because it remains unclear to the Court precisely how many weeks in 2002 APS employed fifteen employees, Defendant's Motion for Summary Judgment on the issue of whether Defendant is an "employer" is denied.

2.     Plaintiff Was Not Required to Establish his Compliance With the
       Administrative Deadlines in his Complaint

_____Title VII sets forth a series of deadlines that must be met in order to have a properly filed Title VII claim.  42 U.S.C. § 2000e–5.  When there is a state agency that exists in order to handle alleged unlawful employment practice claims, the complainant must wait sixty days "after

24

proceedings have been commenced under the State or local law" before filing a discrimination

charge with the EEOC, "unless such proceedings have been earlier terminated. *Id.* The District

of Columbia Office of Human Rights ("OHR") is the agency given the power in the District of

Columbia to deal with unlawful employment claims. D.C. Code § 1–2544(a). The deadline for

filing with the OHR is "within 1 year of the occurrence of the unlawful discriminatory practice or

the discovery thereof." *Id.*

Defendant does not allege that Plaintiff failed to comply with these deadlines, but rather

asserts that Plaintiff's claims are barred because Plaintiff did not affirmatively assert that he

complied with these deadlines in his Complaint. Def.'s Mem. at 6–7. Defendant argues that, per

the "local law on the timely filing of discrimination claims . . . Plaintiff was obligated to plead

facts sufficient to show he satisfied the one year statute of limitations to file his claims."[4] *Id.* at

7.

In federal court, the sufficiency of a complaint is determined according to the Federal

Rules of Civil Procedure. The Supreme Court held that the Federal Rules of Civil Procedure

retain their same meaning and apply equally in Title VII litigation because no statutory language,

legislative history, or judicial interpretation suggests the context of discrimination litigation

affects the application of these rules. *Baldwin County Welcome Ctr. v. Brown*, 466 U.S. 147,

149–50 (1984). "[T]he ordinary rules for assessing the sufficiency of a complaint apply."

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (citing *Scheuer v. Rhodes*, 416 U.S. 232

---

[4]     Defendant avers that Plaintiff's Complaint is deficient for failing to establish compliance
with the "statute of limitations." Def.'s Mem at 6–7. Statute of limitations is an affirmative
defense that must be asserted by a defendant. Fed. R. Civ. P. 8(c). As such, a plaintiff need not
plead compliance with the statute of limitations in his complaint. *Id.*

(1974)).  Pursuant to Rule 8, an employment discrimination complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  *Swierkiewicz*, 534 U.S. at 508 (quoting Fed. R. Civ. P. 8(a)(2)).  Rule 8 does not require plaintiffs to affirmatively establish their compliance with administrative deadlines, such as that set forth for filing with the OHR, and thus, the fact that Plaintiff's Complaint lacks dates does not render his Complaint inadequate.  *See* Fed. R. Civ. P. 8.

The Court notes that Plaintiff's filing with the OHR clearly was timely.  Plaintiff was fired from APS on October 25, 2002.  Pl.'s Opp'n ¶ 15, Ex. V (10/11/02 memo from Kraut to Pl. re: APS Termination).  The Notice of Charge of Discrimination that Plaintiff jointly filed with the OHR and EEOC is dated February 19, 2003.  Pl.'s Opp'n, Ex. VI (Notice of Charge of Discrimination).  Defendant's attempt to have Plaintiff's claims barred on the grounds that his Complaint failed to affirmatively establish compliance with the OHR deadline is denied.

3.   Plaintiff's Complaint Was Untimely According to the Deadline Set Forth in the EEOC Right to Sue Letter

In order to bring a Title VII claim in Federal court, a plaintiff must initiate a civil action within ninety days of receiving a Right to Sue letter from the EEOC.  42 U.S.C. § 2000e–5(f)(1). The statute states that the ninety days begins running upon "notice" that a civil action may be brought.  *Id.*  Plaintiff's Right to Sue letter is dated November 10, 2003, and states that there is a

ninety–day deadline for bringing an action in federal or state court.[5]  Compl., Ex. 1 (Right to Sue letter).  Plaintiff's Complaint was filed February 17, 2004.

Plaintiff and Defendant disagree as to the proper means for determining the date Plaintiff can be said to have received notice of his right to sue.  Defendant argues that pursuant to Federal Rule of Civil Procedure 6(e), Plaintiff would receive an extra three days to account for receiving his notice in the mail.  Def.'s Mem. at 6; Fed. R. Civ. P. 6(e).  Plaintiff, on the other hand, asserts that the EEOC has a presumption of receipt five days after mailing.  Pl.'s Opp'n ¶ 14.  Even assuming Plaintiff's argument were correct, Plaintiff then wrongly asserts that those extra five days would be tacked onto the February 9, 2004 deadline, rather than onto the November 10, 2003 mailing date.  Plaintiff's asserted five day leeway period is meant to account for the receipt of mail, meaning it is properly added onto the mailing date to determine the date Plaintiff should be considered to have received notice of his right to sue.  According to Plaintiff's asserted five day presumption, then, Plaintiff should be said to have received the notice five days after the date of mailing, which would be November 15, 2003, a Saturday.  The filing deadline would then have been ninety days from Plaintiff's stated presumed day of notice (November 15, 2003), which was Friday, February 13, 2004, and yet Plaintiff did not file his Complaint until the following Tuesday, February 17, 2004.

In any event, "the Supreme Court has applied the '3–day' rule of Fed. R. Civ. P. 6(e) to presume that the [Right to Sue] letter is received three days after it is mailed."  *Smith–Haynie v.*

---

[5]     Plaintiff's statements about receiving notice of his right to sue are reft with inconsistency. On the one hand, Plaintiff, in his Opposition, states that he "did not receive the notice until two weeks from the date that the notice was mailed."  Pl.'s Opp'n ¶ 14.  However, during his deposition, Plaintiff testified that he does not recall receiving this notice in the mail.  Def.'s Statement of Facts, Ex. A (Pl. Dep.) at 37:9–38:12.

*District of Colombia*, 155 F.3d 575, 578 n.3 (D.C. Cir. 1998) (citing *Baldwin County*, 466 U.S. at 148 n.1).  Thus, Plaintiff is presumed to have received the letter November 13, 2003, a Thursday, making the ninety day deadline February 11, 2004, a Wednesday.  It is thus clear that Plaintiff was untimely in the filing of  Complaint with this Court.

The Court holds that Plaintiff failed to comply with the EEOC ninety–day deadline for filing his Complaint with this Court, such that Plaintiff's Complaint should be dismissed on this basis.  However, even assuming *arguendo* that Plaintiff's claims were not barred for this reason, the merits of his case still warrant summary judgment in favor of the Defendant on Plaintiff's claims of discrimination under Title VII and the ADA, as well as the claim of hostile work environment under Title VII.

 B. *Summary Judgment on the Merits*

  1. <u>Title VII Claim</u>

Plaintiff brings this action pursuant to Title VII, which states that all personnel actions affecting employees "shall be made free from any discrimination based on race, color, religion, sex, or national origin."[6]  42 U.S.C. § 2000e–16(a).  It is uncontested that Plaintiff was an employee during the relevant time period, and the Court has concluded that there are issues of material fact in dispute regarding whether Defendant is an employer within the meaning of Title

---

[6] In his Opposition, Plaintiff refers both to his race and being "of a different National Origin" to establish that he is a member of a protected class.  Pl.'s Opp'n ¶ 24.  Plaintiff did not plead his national origin as a basis for his discrimination claim, nor even refer to it, in his Complaint.  *See generally* Pl.'s Compl.  Even if national origin discrimination were a claim before the Court, the Court would grant Summary Judgment for the reasons Plaintiff's race–based disparate treatment and hostile work environment claims fail.  However, given the paucity of references to Plaintiff's national origin in the record and his failure to articulate a claim, the Court need not go through a separate analysis on the issue of discrimination based on Plaintiff's national origin.

VII and the ADA.  The Court exercises jurisdiction over Plaintiff's Title VII and ADA claims pursuant to 28 U.S.C. § 1331.

To prove a Title VII violation, Plaintiff must demonstrate by a preponderance of the evidence that the actions of his employer were "more likely than not based on the consideration of impermissible factors" such as race.  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981) (internal quotation marks and citation omitted).  Where, as here, the record contains no direct evidence that APS's employment actions were motivated by racial discrimination, the United States Court of Appeals for the District of Columbia applies the *McDonnell Douglas* tripartite burden–shifting framework to Title VII claims.  *Cones v. Shalala*, 199 F.3d 512, 516 (D.C. Cir. 2000) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).  It is the district court's responsibility to closely adhere to this analysis and go no further, as it does not sit as a "super–personnel department that reexamines an entity's business decisions."  *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (internal citation and quotation marks omitted).

Under the *McDonnell Douglas* paradigm, Plaintiff has the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination.  *McDonnell Douglas*, 411 U.S. at 802.  If he succeeds, the burden shifts to the employer to articulate some legitimate, non–discriminatory reason for Plaintiff's non–selection or termination, and to produce credible evidence supporting its claim.  *Id.*  The employer's burden is only one of production, and it "need not persuade the court that it was actually motivated by the proffered reasons."  *Burdine*, 450 U.S. at 254; *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993) ("[T]he determination that a defendant has met its burden of production (and has thus rebutted any legal

29

presumption of intentional discrimination) can involve no credibility assessment.").  As such, while "the *McDonnell Douglas* framework shifts intermediate evidentiary burdens between the parties, [t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d 647, 651 (D.C. Cir. 2003) (internal citation and quotation marks omitted), *cert. denied*, 540 U.S. 881 (2003); *see also Burdine*, 450 U.S. at 253.

If Defendant is successful, then "the *McDonnell Douglas* framework – with its presumptions and burdens – disappear[s], and the sole remaining issue [is] discrimination *vel non*."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142–43 (2000) (internal citations and quotation marks omitted).  *See also Burke v. Gould*, 286 F.3d 513, 520 (D.C. Cir. 2002) (once defendant offers a non–discriminatory explanation for its actions, the presumption of discrimination "simply drops out of the picture") (quoting *St. Mary's Honor Ctr.*, 590 U.S. at 511).  At that point, Plaintiff has the burden of persuasion to show that the employer's proffered reason was not the true reason for the employment decision.  *Burdine*, 450 U.S. at 256.  Pretext may be established "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  *Id.* at 256.  *See also Reeves*, 530 U.S. at 143.  "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive."  *Reeves*, 530 U.S. at 147 (citing *St. Mary's Honor Ctr.*, 590 U.S. at 517) ("[P]roving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination.").  *See also Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1290 (D.C.

Cir. 1998) (en banc) ("[A] plaintiff's discrediting of an employer's stated reason for its employment decision is entitled to considerable weight.").  Notably, the Supreme Court has taken care to instruct trial courts that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148.  "[T]he trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual." *Id.* at 143 (quoting *Burdine*, 450 U.S. at 255 n.10).

Accordingly, "to survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason." *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003); *see also Aka*, 156 F.3d at 1290.  The D.C. Circuit recently defined "all of the evidence" as "any combination of (1) evidence establishing the plaintiff's prima facie case; (2) evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff, such as independent evidence of discriminatory statements or attitudes on the part of the employer." *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006) (citing *Aka*, 156 F.3d at 1289).  "At this stage, if [plaintiff] is unable to adduce evidence that could allow a reasonable trier of fact to conclude that [defendant's] proffered reason was a pretext for discrimination, summary judgment must be entered against [plaintiff]." *Paquin v. Fed. Nat'l Mortgage Ass'n*, 119 F.3d 23, 27–28 (D.C. Cir. 1997).  "[T]he court must consider all the evidence in its full context in deciding whether the plaintiff has met

31

his burden of showing that a reasonable jury could conclude that he has suffered discrimination . . . ." *Aka*, 156 F.3d at 1290.

a.   *Plaintiff's Prima Facie Case*

To establish a prima facie case of disparate treatment race–based discrimination under Title VII, Plaintiff must show that: "(1) [h]e is a member of a protected class; (2) [h]e suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Mastro v. Potomac Elec. Power, Co.*, --- F.3d ---, 2006 WL 1359604, at *4 (D.C. Cir. May 19, 2006) (quoting *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005);. *See also Mitchell v. Baldrige*, 759 F.2d 80, 84 (D.C. Cir. 1985); *Douglas v. Pierce*, 707 F. Supp. 567, 571 (D.D.C. 1988), *aff'd*, 906 F.2d 783 (1990); *cf. Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002) (quoting *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999)).   The third prong can be satisfied if a plaintiff can show that he was "treated differently from similarly situated employees who are not part of the protected class." *Mastro*, --- F.3d ---, 2006 WL 1359604, at *4 (quoting *Leavitt*, 407 F.3d at 412) (internal quotation marks omitted); *see also Douglas*, 707 F. Supp. at 571.   "The prima facie case 'raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.'" *Burdine*, 450 U.S. at 254.

In this case, it is clear that Plaintiff has met the first prong of the prima facie case – he is an African–American, and therefore a member of a protected class.[7]   To establish the second

---

[7]     In his Complaint, with respect to his Title VII allegations, Plaintiff states that he "belongs to a class protected under the statute, namely he is [sic] African American male, over 40 years of age and suffered from a disability." Compl. ¶ 6 (citing 42 U.S.C. § 2000e(b)).  While Plaintiff lumps his claims of both racial and disability discrimination under Title VII, Title VII of course does not cover claims of disability discrimination.  *See* 42 U.S.C. § 2000e–16(a) (stating that all

prong, an adverse employment action, an employment decision must inflict "objectively tangible harm." *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001) (recognizing that this requirement "guards against both judicial micromanagement of business practices, and frivolous suits over insignificant slights") (internal quotation marks omitted). "An 'employment decision does not rise to the level of an actionable adverse action . . . unless there is a tangible change in the duties or working conditions constituting a material employment disadvantage.'" *Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002) (quoting *Walker v. WMATA*, 102 F. Supp. 2d 24, 29 (D.D.C. 2000); *see also Russell*, 257 F.3d at 818 ("[N]ot everything that makes an employee unhappy is an actionable adverse action. Minor and even trivial employment actions that an irritable, chip–on–the–shoulder employee did not like would otherwise form the basis of a discrimination suit") (citations and internal quotation marks omitted). "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).

Plaintiff's claims that Defendant violated Title VII by:

asking Plaintiff to perform menial task[s] in front of his co–workers, asking Plaintiff to engage in unethical accounting principles, denying Plaintiff reasonable accommodation [permission to work from home] during a period of disability, giving younger Caucasian employees preferential treatment in promotions and jobs, creating a hostile work environment and wrongfully demoting and terminating [Plaintiff].

---

personnel actions affecting employees "shall be made free from any discrimination based on race, color, religion, sex, or national origin." Any allegations Plaintiff makes regarding disability discrimination will be addressed during the Court's discussion of Plaintiff's ADA claim.

Compl. ¶ 9.  In his Opposition, Plaintiff refers to additional discriminatory practices: "being

excluded from [a] key hiring decision," not being invited to a hearing on Capitol Hill to which

only white employees were invited, being "admonished for providing information to an employee

about her leave," being told he "was not allowed to close his door and on one occasion . . .

chastised in front of new employees for having his door closed," and being "addressed and

treated in a derogative manner by the Defendant in the presence of the Board of Directors and

other employees."  Pl.'s Opp'n ¶¶ 21, 23.

    Many of Plaintiff's examples of discrimination, such as being asked to perform a menial

task or not being invited to Capitol Hill, fall squarely within what was envisioned in *Russell*

where the instant circuit referred to "trivial employment actions."  257 F.3d at 818.  Plaintiff

being asked to follow what he considered to be improper or unethical accounting principles

would not constitute "a significant change in employment status" and does not resemble any of

the examples listed in *Burlington.*  524 U.S. at 761.  Similarly, while being "chastised" and

"treated in a derogative manner" may have made Plaintiff "unhappy," these actions do not

constitute adverse employment actions.  *Russell*, 257 F.3d at 818.  Additionally, the only mention

of the incident with the Board of Directors is in Plaintiff's Opposition, and the Court finds no

evidence to substantiate this occurrence in the record before it.  Plaintiff's alleges he was

excluded from "key hiring decisions," while his own deposition testimony reveals that his role at

APS did not include participating in the hiring process, and his true grievance was not being

provided with adequate information to conduct the orientation of the newly hired employees,

which does not meet the definition of adverse employment action.  Def.'s Statement of Facts, Ex.

B (Pl. Dep) at 137:2–139:12.  Finally, being told to keep his door open during an employee

orientation similarly does not rise to the level of adverse employment action.[8]

Plaintiff alleges that Defendant failed to accommodate Plaintiff during a time of

disability, refusing to allow him to work from home while non–African–American employees

were allowed to do so.  Pl.'s Opp'n ¶ 17.  Faced with similar allegations, the court in *Dorchy v.*

*Washington Metropolitan Transit Authority* drew upon the *McDonnell Douglas* framework to

determine the appropriate prima facie case for a failure to accommodate in the context of a Title

VII claim.  45 F. Supp. 2d 5, 14–15.  Plaintiff must show that: "(1) he is a member of a protected

group; (2) that he had a disability; (3) that he requested an accommodation for his disability; (4)

that his employer failed to make a reasonable accommodation for his disability; and (5) that other

similarly–situated employees who were not members of a protected group were given

accommodations for their disabilities."  *Id.*

As will be addressed more fully during the Court's discussion of Plaintiff's failure to

accommodate claim under the ADA, Plaintiff has failed to show that he is disabled and that he

requested that Defendant accommodate his disability, and for these reasons alone, his Title VII

claim based on an alleged failure to accommodate would fail.  Additionally Plaintiff has failed to

establish a record from which a jury could conclude that Defendant treated Plaintiff differently

from similarly–situated, non–African–American employees on the basis of his race.  Plaintiff

bases his allegations that, unlike white employees, he was denied the opportunity to work from

---

[8]     The aforementioned employment actions are insufficient individually to constitute
adverse employment actions for the purposes of a Title VII disparate treatment claim.  However,
the Court notes that such actions could be considered together in the context of a Hostile Work
Environment claim, and the Court will entertain such a claim elsewhere in this Memorandum
Opinion.

home during a time of disability, on two alleged instances of white employees being afforded this accommodation: first, that a "white male contractor was allowed to work from his home and access the office computers;" and second, that Brookhart was supposedly allowed to work from home after the birth of her child. Pl.'s Opp'n ¶ 17. The "white male contractor" is never identified, and there is nothing in the record to substantiate this employee being allowed to work from home. Regarding the second example, Brookhart's testimony indicates that she worked part–time and makes no mention of working from home. Pl.'s Opp'n, Ex. VII (Brookhart Dep.) at 51:1–21. Even if her testimony had indicated that she worked from home after the birth of her child, which occurred in 1992, this as the sole example of white employees being allowed to work from home would not suffice to show Plaintiff was treated differently than similarly situated whites because the Court has no record of the nature of Brookhart's role with APS at the time to determine if Plaintiff and Brookhart were similarly–situated. Plaintiff has failed to provide evidence from which a jury could infer that Plaintiff was treated differently from a similarly–situated, non–African–American employee. Plaintiff fails to make out a prima facie case on this allegation.

While "giving younger Caucasian employees preferential treatment in promotions and jobs" would constitute an adverse employment action, as it comports with the list of examples in *Burlington*, the only basis for this assertion is a somewhat confusing affidavit by Barbara Givens, a fellow African–American employee who, in addition to listing the instances she allegedly was mistreated because of her age, religion and race, stated that: "[o]ur work was undermines [sic] and we did not receive acknowledgement or bonuses for good work being done. The whites work was received well and given raises and job title changes often. Nine Blacks were fired or

encouraged to quit within one year."  Pl.'s Opp'n, Ex. III–B (First Givens Aff.).  The Court notes

that, while Plaintiff included this affidavit with its Opposition, Plaintiff included it only to

support his contention that APS had the requisite fifteen full time employees.  Not once does

Plaintiff cite to the affidavits of his former fellow employees towards the substance of his race

discrimination claims.  *See* Pl.'s Opp'n ¶¶ 22–24.  Additionally, in his interrogatory responses,

Plaintiff states that "[s]ubsequent to the demise of Diana Green, the Deputy Executive Director

of a total staff of fifteen, the following staff have turned in their resignation or [been] terminated:

Director of Meetings and Conventions, the Manager of Membership, the membership Associate,

the membership associate/accounting assistant, the Director of Accounting and Administration.

The common thread is that all the above mentioned individuals are minority." Def.'s Statement

of Facts, Ex. D (Pl.'s Interrog. Answers) No. 7.  Plaintiff fails to substantiate these assertions

with any facts in the record.

  In the post–discovery summary judgment context, a conclusory affidavit, supported by no

evidence within the record is insufficient to avoid summary judgment.  *See Johnson v. United*

*States Capitol Police Bd.*, Civ. No. 03–614 (HHK), 2005 WL 486743, at *2 (D.D.C. March 2,

2005) (finding that an affidavit submitted in opposition to a summary judgment motion did not

meet the standard under Rule 56 because it was "unsupported by any record evidence");

*Matthews v. Hesburgh*, 504 F. Supp. 108, 114 n.16 (D.D.C. 1980), *aff'd*, 672 F.2d 895 (D.C. Cir.

1981) ("Mere allegations even in an affidavit, unsupported by specific facts, are insufficient to

resist a motion for summary judgment").  There is simply nothing in the record before the Court

to substantiate the affidavit's assertion that white employees were promoted while

African–American employees were fired and/or not promoted.  As such, there is no factual

record showing that APS treated Plaintiff and other African–Americans differently than similarly–situated non–African–Americans in its hiring and promotion practices.

Clearly Plaintiff's termination constitutes an adverse employment action and fulfills this second prong.[9]  However, Plaintiff has not provided any evidence to fulfill the third prong – that in terminating Plaintiff, Defendant was treating him differently than similarly–situated employees who are not African–American, giving rise to an inference of discrimination.  In the context of a wrongful termination claim, this prong can be met by "showing that [Plaintiff] was not terminated for 'the two . . . common legitimate reasons for discharge: performance below the employer's legitimate expectations or the elimination of the plaintiff's position altogether.'" *Mastro*, --- F.3d ---, 2006 WL 1359604, at *4 (quoting *Leavitt*, 407 F.3d at 412).  While Plaintiff states that he was replaced by a white employee, a claim that is not substantiated anywhere in the record, the position Plaintiff held no longer existed upon his termination, and so any employee who was subsequently hired was filling a different role at APS.[10]  Pl.'s Opp'n ¶ 22; Def.'s Statement of Facts, Ex. E (Separation Agreement).  Regardless, the instant circuit has "rejected as immaterial a requirement that the plaintiff be replaced by an individual outside her protected class. . . . The plaintiff need only show that the position continues to exist and was filled."

---

[9]     In his Complaint, Plaintiff refers to his being "demoted," which would be considered an adverse employment action.  Compl. ¶ 9.  But it is clear from the language of the Separation Agreement that Plaintiff's employment was to end according to the dates set forth in the agreement because APS was restructuring his position, and thus the Court considers the Separation Agreement to be the earliest notice of his termination, and not as Plaintiff asserts, a demotion.  Def.'s Statement of Facts, Ex. E (Separation Agreement).

[10]     The Court notes that neither Plaintiff nor Defendant present evidence as to who, if anyone, took over the accounting duties that the Separation Agreements indicates were eliminated from Plaintiff's position when it was restructured from the "Director of Finance model" to the "Accountant/Bookkeeper/Office Manager model."

*Mastro*, --- F.3d ---, 2006 WL 1359604, at *4 (citing *Leavitt*, 407 F.3d at 412–13; *Stella*, 284

F.3d at 146.

Defendant has offered evidence that is undisputed by Plaintiff that Plaintiff's position at

APS was restructured to fit a different model than the one under which Plaintiff was hired.

Def.'s Statement of Facts, Ex. E (Separation Agreement).  Plaintiff stated in his deposition that,

despite references in the Separation Agreement to prior discussions regarding APS's decision to

transition Plaintiff's position to a different model, Plaintiff's receipt of the agreement was his

first notice of this change.  Def.'s Statement of Facts, Ex. B (Pl. Dep.) at 153:14–156:4.

However, this discrepancy is not material because it does not serve to dispute the fact that

Defendant sought to make this change, only when Plaintiff claims to have known about it.

Further, as will be discussed more fully below, Defendant has produced various communications

between Plaintiff and other employees expressing their dissatisfaction with Plaintiff's

performance of the duties of his position, none of which are in dispute in the record before the

Court.  *See* Def.'s Statement of Facts, Ex. F–1 (9/19/02 memo from Kraut to Pl. re: For our

discussion), Ex. F–2 (9/17/02 email from Brookhart to Pl. re: August Books), Ex. F–3 (9/27/02

email from Sahibzada to Pl. re: error in medical insurance deduction), Ex. F–4 (10/4/02 email

from Weaver to Pl. re: status of open invoices), Ex. E (Separation Agreement), Ex. A (Pl. Dep.)

at 55:14–58:21, 65:21–66:12, 71:3–21, 74:2–21, 83:1–21..  Thus, Plaintiff has failed to show that

his termination was not due to *Mastro's* "legitimate reasons": elimination of Plaintiff's position

and performing below the employer's expectations.

Nor has Plaintiff offered any evidence from which a jury could infer that he was treated

differently than similarly–situated employees of a different race, such as APS retaining a

comparably qualified non–African–American employee while terminating Plaintiff.  Thus,

though Plaintiff's termination constitutes an adverse employment action, he fails to prove the

third prong of his prima facie case, that he was treated differently than similarly–situated

employees outside the protected class, and there is no basis for drawing the inference that the

termination was racially motivated.  However, the Court will assume, only for the purposes of

argument, that Plaintiff successfully fulfilled each element of his prima facie disparate treatment

claim regarding his termination and proceed with the rest of the *McDonnell Douglas* test for this

particular allegation.

           b.       *Defendant's Burden of Production*

           Defendant fulfills the second prong of the *McDonnell Douglas* balancing framework by

producing legitimate, non–discriminatory reasons for Plaintiff's termination substantiated by

credible evidence to support Defendant's claim.  *See McDonnell Douglas*, 411 U.S. at 802.  A

defendant must articulate legitimate, non–discriminatory reasons with "sufficient clarity" to

allow plaintiff to show that such reasons are pretextual.  *Burdine*, 450 U.S. at 255–56.  Defendant

argues that Plaintiff has failed to rebut the "ample evidence in the record indicating that APS had

legitimate, nondiscriminatory concerns about Plaintiff's ability to correctly perform the duties

and responsibilities of his job."  Def.'s Mem. at 15; Def.'s Statement of Facts ¶¶ 50–54.  These

reasons include other employees' complaints about Plaintiff's not being "on top of the details" of

his position; "long delays" in the performance of "seemingly simple requests"; Plaintiff's failure

to comply with Brookhart's request that she be present when he closed the monthly books;

Plaintiff's repeated errors in his accounting duties and subsequent failure to correct such errors;

and, perhaps most importantly, the restructuring of Plaintiff's position at APS to one under which

Plaintiff's skills would have been wasted.  *Id.*, Ex. F–1 (9/19/02 memo from Kraut to Pl. re: For

our discussion), Ex. F–2 (9/17/02 email from Brookhart to Pl. re: August Books), Ex. F–3

(9/27/02 email from Sahibzada to Pl. re: error in medical insurance deduction), Ex. F–4 (10/4/02

email from Weaver to Pl. re: status of open invoices), Ex. E (Separation Agreement).  Defendant

has met its obligations under the *McDonnell Douglas* test and presented numerous legitimate,

non–discriminatory reasons for Plaintiff's termination, none of which are factually disputed by

Plaintiff.

c.      <em>Plaintiff's Burden of Persuasion</em>

At this point, Plaintiff has the burden of persuasion to show that the Defendant's

proffered reasons for his termination were not the true reasons behind this employment decision.

*Burdine*, 450 U.S. at 256.  In his Opposition, Plaintiff fails to offer any argument "persuading the

court that a discriminatory reason more likely motivated the employer or indirectly by showing

that the employer's proffered explanation is unworthy of credence."  *Id.*  In fact, Plaintiff seems

to not understand that Defendant's burden is one of production, and that once Defendant has

provided legitimate reasons for its acts supported by admissible evidence, the burden of

persuasion shifts back to Plaintiff.  *Id.* at 254 ("The defendant need not persuade the court that it

was actually motivated by the proffered reasons).

Instead, Plaintiff argues, "[t]he burden then shifts to the Defendant to establish a

non–discriminatory reason for his actions.  Defendant has failed to establish that its reasons for

all of the above stated acts were nondiscriminatory and not pretext for its discrimination."  Pl.'s

Opp'n ¶ 24.  Of course, it is *Plaintiff's* burden to show that "the proffered reason [by Defendant]

was not the true reason for the employment decision.  This burden now merges with the ultimate

41

burden of persuading the court that [Plaintiff] has been the victim of intentional discrimination."

*Burdine*, 450 U.S. at 256.  Given that Plaintiff thought Defendant bore the burden of showing its

proffered reasons were the actual reasons for Plaintiff's termination, Plaintiff does not even

attempt to articulate why APS's proffered reasons were pretextual.  Thus, by offering no

argument rebutting APS's stated legitimate business reasons for Plaintiff's termination, Plaintiff

has not fulfilled this third component of the *McDonnell Douglas* framework.

The only argument Plaintiff makes that the Court could construe as an attempt to rebut

Defendant's legitimate business reasons for Plaintiff's termination is his assertion that he was not

reprimanded and did not receive any negative feedback until Brookhart became his supervisor

and "began to invent problems with the Plaintiff."  Pl.'s Opp'n ¶ 23.  Plaintiff has offered no

evidence to substantiate his assertion that prior to Brookhart's becoming his supervisor, he "was

always complemented [sic] on [his] good job performance."  Def.'s Statement of Facts, Ex. D

(Pl.'s Interrog. Answers) No. 15.  To the contrary, Kraut's September 19, 2002 memorandum

refers to previous discussions between Kraut and Plaintiff about Plaintiff needing to improve his

performance, as well as the fact that other employees expressed "skepticism" regarding

Plaintiff's oral reports, felt he did not properly inform them of benefits per his job duties, and

was not proficient or efficient in the performance of his accounting duties.  Def.'s Statement of

Facts, Ex. F–1 (9/19/02 memo from Kraut to Pl. re: For our discussion).  Plaintiff remembers

receiving this and other office correspondence communicating dissatisfaction with his

performance, and, based on the record before the Court, does not dispute the facts relayed in

them, except that, "from [his] perspective," he was providing adequate information to other

employees about their benefits.  Def.'s Statement of Facts, Ex. A (Pl. Dep.) at 55:14–58:21,

65:21–66:12, 71:3–21, 74:2–21, 83:1–21.  Thus, contrary to Plaintiff's assertion that the source

of any negative feedback about his job performance was Defendant "invent[ing] problems," with

him only after Brookhart became his supervisor, Kraut, the Executive Director, and various other

employees, in addition to Brookhart, felt Plaintiff was not adequately fulfilling his role at APS.

Pl.'s Opp'n ¶ 23; Def.'s Statement of Facts, Ex. F–1 (9/19/02 memo from Kraut to Pl. re: For our

discussion).

   The Court notes that of all of his supervisors at APS, Brookhart was the only individual

Plaintiff felt might "possibly" have had "any issues with [him] because of [his] national origin or

skin color . . . [because] her actions tend[ed] to give [him] that impression."  Def.'s Statement of

Facts ¶¶ 52–53, Ex. A (Pl. Dep.) at 102:15–103:4.  Nonetheless, Plaintiff did not recall Brookhart

"making a disparaging comment about [Plaintiff]" because of his national origin, age, or physical

abilities.  *Id.* at 103:17–104:4.  When asked if he "ever hear[d] anyone else attribute any

comments to either Alan Kraut or Sarah Brookhart of a disparaging nature . . . about [Plaintiff]

because of [his] national origin, [his] age or [his] physical condition," Plaintiff testified that any

such source he might have was a "third party" who Plaintiff did not feel was credible and that he

"didn't take [such comments] as serious because it wasn't direct."  *Id.* at 104:5–16.  Kraut and

other employees, who Plaintiff did not feel had negative feelings about his race, felt his job

performance was inadequate.  Given that multiple employees viewed Plaintiff's job performance

was deficient, Plaintiff's insinuation that the real reason for his termination was Brookhart's

"possibly" having issues with his race fails to satisfy Plaintiff's burden of showing that his

termination was not for legitimate, non–discriminatory reasons.

43

In sum, Plaintiff fails to make a prima facie case of disparate treatment for all of the claims of racial discrimination that he asserts.  Regarding his assertion that his termination was racially motivated, even assuming he had fulfilled his prima facie case, Plaintiff has failed to show that Defendant's proffered legitimate, non–discriminatory reasons were pretextual, and thus has failed to fulfill its burden of persuasion that his termination was, in fact, racially motivated. As such, Defendant's Motion for Summary Judgment as to Plaintiff's Title VII discrimination is granted.

2.    Hostile Work Environment Claim

Plaintiff also asserts that Defendant violated Title VII by creating a hostile work environment upon Brookhart's becoming Deputy Director and Plaintiff's supervisor. Specifically, Plaintiff alleges he:

> was asked to do menial tasks, refused reasonable accommodation, accused of insubordination, excluded from key hiring decision [sic], excluded from activities and privileges of his position as Director of accounting and administration.  Only white employees were allowed to attend Capital [sic] Hill session concerning APS; some of these employees were Plaintiff's subordinates.  He was asked to stop accounting principles that were in line with the recommendations of the auditor. . . . Plaintiff was not allowed to close his door and on one occasion was chastised in front of new employees for having his door closed.  He was never informed about the door closing policy prior to that occasion.  After informing Defendant about the development of Spinal stenosis in the first week of October 2002, Plaintiff was presented with a separation agreement and then terminated after refusing to accept and sign it.

Pl.'s Opp'n ¶ 21.

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–2(a)(1).  "Terms,

conditions, or privileges" encompass tangible as well as psychological harm.  *See Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986).  In addition, the Supreme Court has held that "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Vinson*, 477 U.S. at 65) (internal citations omitted).

To establish a claim of hostile work environment based on race, a plaintiff must demonstrate:  "'(1) that he or she suffered intentional discrimination because of race; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability.'"  *Raymond, v. U.S. Capitol Police Bd.*, 157 F. Supp. 2d 50, 57 (D.D.C. 2001) (quoting *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081 (3d Cir. 1996)).  In determining whether a hostile work environment exists, the Supreme Court has directed the courts to look at the totality of the circumstances, including the "'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998) (quoting *Harris*, 510 U.S. at 23).

Being asked to perform 'menial tasks' (which Plaintiff alleges occurred a total of two times), Def.'s Statement of Facts, Ex. B (Pl. Dep.) at 125:15–128:13, 156:9–158:2, not being invited to attend a hearing on Capitol Hill, being told to perform accounting practices that did not comport with the auditor and Plaintiff's views of proper procedure, being told to keep his office

door open during an orientation, and being chastised in front of new employees on one occasion,

do not meet the factors set forth in *Faragher* because these incidents were not frequent, severe,

physically threatening or humiliating, nor does Plaintiff assert that these incidents interfered with

his work performance.  Though Plaintiff testified that the manner in which Brookhart

reprimanded him for having his door closed during the new employee orientation was

"disrespectful" and "hostile," nothing in his testimony indicates that her conduct rose to the level

of frequent, severe discriminatory conduct that was physically threatening or humiliating.  Def.'s

Statement of Facts, Ex. B (Pl. Dep.) 139:13–141:19; Pl.'s Opp'n, Ex. II–A (Pl. Aff.).  The

Supreme Court's "standards for judging hostility are sufficiently demanding to ensure that Title

VII does not become a 'general civility' code.  Properly applied, they will filter out complaints

attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive

language . . . .'" *Faragher*, 524 U.S. at 788 (internal citations omitted).  As for Plaintiff's

assertion that he was "excluded from activities and privileges of his position as Director of

accounting and administration," Plaintiff cites to nothing in the record to elucidate any specific

incidents to which he refers.  Pl.'s Opp'n ¶ 21.

Regarding Defendant asking Plaintiff to sign the Separation Agreement and the

subsequent termination of Plaintiff when he refused to sign the agreement, these incidents do not

amount to a hostile work environment.  First, neither of these incidents can be said to be

frequent, pervasive or regular.  According to the terms stated in the Separation Agreement, dated

October 9, 2002, Plaintiff's employment would terminate at the end of that month.  Def.'s

Statement of Facts, Ex. E (Separation Agreement).  Secondly, nothing about either the Separation

Agreement or the letter of termination is severe, physically threatening or humiliating.  *See id.*;

46

Pl.'s Opp'n, Ex. V (10/11/02 memo from Kraut to Pl. re: APS Termination).  To the contrary, the

Separation Agreement sought to end Plaintiff's employment with APS on amiable terms, offering

to provide Plaintiff with a reference, noting Plaintiff's "diligence and hard work on behalf of

APS."  Def.'s Statement of Facts, Ex. E (Separation Agreement).

       Further, Plaintiff's prima facie case requires that he prove he "suffered intentional

discrimination *because of race*."  *Raymond*, 157 F. Supp. 2d at 57 (emphasis added).  With the

possible exception of the Capitol Hill incident, Plaintiff has not presented evidence from which

the Court could conclude these incidents were in any way related to Plaintiff's race, even if these

actions did rise to the level of severity, offensiveness and frequency envisioned by the Supreme

Court.  For example, Plaintiff makes no argument as to how his supervisors asking him to move

boxes, keep his office door open, or perform unfavorable accounting practices had anything to do

with his being African–American.  While Plaintiff argues that he was accused of insubordination,

he has not presented evidence that shows any reprimands he received were unwarranted, and thus

the Court has no reason to conclude Defendant's conduct was not based on legitimate criticisms

of Plaintiff's performance.  Similarly, Plaintiff has not provided the Court with evidence that his

termination was because of his race, in that he has not rebutted Defendant's reasons for his

termination, including the restructuring of Plaintiff's position at APS.  Thus, even if Plaintiff had

alleged conduct on the part of APS that was severe, offensive and frequent enough to comport

with the Supreme Court's definition of hostile work environment, he has utterly failed to provide

any basis for concluding these actions were taken because of Plaintiff's race.

       The Capitol Hill incident, the only example pleaded by Plaintiff from which a jury could

possibly infer racial intent, falls far short of the kind of conduct that creates a hostile work

environment, in that it was a one–time occurrence, not highly offensive and had nothing to do

with Plaintiff's work performance.  Def.'s Statement of Facts, Ex. B (Pl. Dep.) 172:15–175:17.

Plaintiff testified that the purpose of APS employees attending was "to be present, to listen to it,

to watch, to be there, to support him or whatever."  *Id.* at 173:17–21.  Plaintiff also stated that his

issue with not being invited was that "only specific individuals [were] asked any not everyone"

and that there was "no rhyme or reason" to the group selected in terms of their roles at APS or

relationship to the testimony.  *Id.* at 174:13–16, 174:17–175:17.

In *Holbrook v. Reno*, regarding a sexual harassment hostile work environment claim, this

circuit elaborated on the type of conduct that comports with the Supreme Court's requirement in

the context of a hostile work environment claim that an employer's conduct affect the

employee's performance of his job:  "Did the nature of the [conduct] change the nature of

[Plaintiff's] job?  Did the [conduct]  change how [Plaintiff] felt about [his] job?  Did it interfere

with [his] job performance or make it more difficult for [him] to do [his] job?  Did it change how

people treated [him]?"  196 F.3d 255, 262–63 (D.C. Cir. 1999).  Plaintiff has not alleged that not

being invited to attend the hearing in any way affected his ability to perform his job, particularly

given that Plaintiff's own testimony indicated that attending the hearing had absolutely nothing

to do with his role at APS, but rather would have been to support the attorney testifying and to

listen.

Further, "only in rare and extreme circumstances will one incident be held to create a

hostile work environment."  *Ramey v. Potomac Elec. Power Co.*, 2006 WL 1102836, *5 n.8

(D.D.C. Mar.31, 2006) (citing *Tatum v. Hyatt Corp.*, 918 F. Supp. 5, 7 (D.D.C. 1994)).

"Although a pattern or practice of harassment directed at a single employee can violate Title VII,

casual or isolated manifestations of a discriminatory environment, such as a few ethnic or racial

slurs, may not raise a cause of action." *Bundy v. Jackson*, 641 F.2d 934, 943 n.9 (D.C. Cir.

1981). Here, the only incident of APS's conduct from which a jury could infer racial intent, the

Capitol Hill incident, did not involve any explicit references to race, and the extent of Plaintiff's

allegations is that on one occasion, five or six white employees and no minority employees were

invited to attend a hearing in order to provide support for the attorney testifying. Def.'s

Statement of Facts, Ex. B (Pl. Dep.) at 172:15–175:17. This incident was not part of a "pattern

or practice or harassment," *Bundy*, 641 F.2d at 943 n.9, nor is it extreme enough, as a single

incident, to constitute hostile work environment, *Ramey*, 2006 WL 1102836, *5 n.8.

Thus, each of Plaintiff's examples of Defendant's alleged conduct fails to rise to the type

of treatment contemplated by the statutory language and Supreme Court's definition of hostile

work environment. The Court shall grant summary judgment on this claim for Defendant.

3.    ADA Claim

Plaintiff brings this action pursuant to the ADA, which states that it is unlawful to

"discriminate against a qualified individual with a disability."[11] 42 U.S.C. § 12112 (a). It is

uncontested that Plaintiff was an employee during the relevant time period, and the Court has

---

[11]    Plaintiff's Complaint does not, in fact, plead a separate ADA claim, but alleges that
"Defendant . . . in violation of Title VII: . . . den[ied] Plaintiff reasonable accommodation during
a period of disability." Compl. ¶ 9. Additionally, the Complaint states Plaintiff's being denied
permission "to work from home when he was ill" while a white employee was allowed to work
from home as a basis for Plaintiff's hostile work environment claim. Compl. ¶ 28. Only in his
Opposition does Plaintiff articulate a separate ADA claim, that "Plaintiff received permission to
work at home prior to his surgeries but the new acting director [Brookhart] refused the
accommodation under the pretext of office security." Pl.'s Opp'n ¶ 17. *See generally* Pl.'s
Opp'n ¶¶ 17–20.

concluded that there are issues of material fact in dispute regarding whether Defendant is an employer within the meaning of Title VII and the ADA.  The Court exercises jurisdiction over Plaintiff's ADA claim pursuant to 28 U.S.C. § 1331.  The ADA defines discrimination to include the failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the [employer's] business."  42 U.S.C. § 12112(b)(5)(A).

In order to make a prima facie case for failure to accommodate under the ADA, a plaintiff must show:  "'(1) that [he] was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of [his] disability; (3) that with reasonable accommodation [he] could perform the essential functions of the position; and (4) that the employer refused to make such accommodations.'"[12]  *Nichols v. Billington*, 402 F. Supp. 2d 48, 78 (D.D.C. 2005) (quoting *Scarborough v. Natsios*, 190 F. Supp. 2d 5, 19 (D.D.C. 2002)).

Disability, for the purposes of the ADA, is defined as follows:  "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

---

[12]     This circuit has held that the *McDonnell Douglas* framework is not always appropriate in disability discrimination cases because, in the context of a failure to accommodate claim, "the fact that the plaintiff's handicap was taken into explicit account in the agency's employment or personnel decision is acknowledged.  These cases deal with objective claims that may be tested through the application of traditional burdens of proof."  *Barth v. Gelb*, 2 F.3d 1180, 1186 (D.C. Cir. 1993).  Such a case differs from a disparate treatment claim because there, the burden shifting framework is needed to "inquir[e] into subjective facts – the employing agency's true motivation . . . " whereas the issue in a failure to accommodate claim is not whether the employer considered the employee's disability but rather, whether the employer's conduct in considering the employee's disability was reasonable.  *Id.* at 1186–87.
    Because the Court has determined that Plaintiff failed to make out a prima facie case for this claim, the Court need not determine what the appropriate allocation of burdens would be in this instance.

(B) a record of such an impairment; or (C) being regarded as having such an impairment."  42

U.S.C. § 12102(2).  EEOC regulations implementing the ADA provide definitions for various

aspects of the statute.  29 CFR § 1630.1 ("The purpose of this part is to implement title I of the

Americans with Disabilities Act (42 U.S.C. 12101, et. seq.) . . . .").  A "major life activity" is

defined as a "functio[n] such as caring for oneself, performing manual tasks, walking, seeing,

hearing, speaking, breathing, learning, and working."  29 CFR § 1630.2(I).  "[S]ubstantially

limit[ed] means '[u]nable to perform a major life activity that the average person in the general

population can perform'; or '[s]ignificantly restricted as to the condition, manner or duration

under which an individual can perform a particular major life activity as compared to the

condition, manner, or duration under which the average person in the general population can

perform that same major life activity.'"  *Toyota Motor Mfg. v. Williams*, 534 U.S. 184, 195–96

(2002) (quoting 29 CFR § 1630.2(j) (2001)).  Relevant factors to be considered when

determining if someone is limited in a major life activity are: "'[t]he nature and severity of the

impairment; [t]he duration or expected duration of the impairment; and [t]he permanent or

long–term impact, or the expected permanent or long–term impact of or resulting from the

impairment.'"  *Toyota*, 534 U.S. at 196 (quoting 29 CFR §§ 1630.2(j)(2)(i)–(iii)).

    Plaintiff's basis for his assertion that Defendant discriminated against him in violation of

the ADA is that APS did not allow him to work from home during a time when he was disabled

due to cancer and spinal stenosis.[13]  Pl.'s Opp'n ¶¶ 17–20.  While Plaintiff asserts that he was

---

[13]    Though Plaintiff did not plead, in his Complaint or Opposition, a claim of disparate
treatment in violation of ADA, the record contains several references that suggest Plaintiff felt he
received such treatment.  For example, Plaintiff alleges that he "had recently undergone two
serious operations, yet, demands were made of [him] to engage in activities that were inimical to
[his] health.  Def.'s Statement of Facts, Ex. D (Pl.'s Interrog. Answers) No. 8.  In his deposition,

51

disabled within the meaning of this language, he has not described in any detail the nature of his

disability nor provided medical documentation of it such that there is no evidentiary basis for

concluding that his alleged impairments precluded him from engaging in a major life activity.

*See* Pl.'s Opp'n ¶¶ 17–20.  In fact, Plaintiff never asserts what major life activities his alleged

disability limited.  *Id*.  Presuming Plaintiff is asserting that his disability limited his ability to

work, Plaintiff offers absolutely no evidence as to how his particular impairment was

incompatible with his ability to perform any functions of his position at APS, let alone how he is

precluded from performing a "broad class of jobs" as is required.  *Sutton v. United Air Lines,*

---

Plaintiff explained that his job required him to retrieve materials kept in boxes he would have had to pull down, and that when Plaintiff asked Brookhart if someone else could do the lifting, she told him to ask another employee.  Def.'s Statement of Facts, Ex. B (Pl. Dep.) at 156:5–157:9.  Plaintiff also alleges he was "admonished by Sarah Brookhart and singled out to call her directly" when he called the receptionist to inform the APS staff Plaintiff would be missing work due to illness.  Def.'s Statement of Facts, Ex. D (Pl.'s Interrog. Answers) No. 7.  Additionally, Plaintiff's recitation of the incidents preceding his termination is intermingled with references to his alleged disability, suggesting he may have thought APS terminated him because of his alleged diagnosis.  For example, his responses to Defendant's interrogatories states:  "[a]fter informing Defendant about the development of Spinal stenosis in the first week of October, 2002, Plaintiff was presented with a separation agreement and then terminated after refusing to accept and sign it."  Pl.'s Opp'n ¶ 21; *see also* Def.'s Statement of Facts, Ex. D (Pl.'s Interrog. Answers) No. 7 ("I was very open and honest about my condition however, during the second week of October, the Executive Director presented me with a document [the Separation Agreement] and requested that I sign it. . . . I found it rather strange that my position was the only one being downgraded . . . .").

　　　To make a prima facie case of disparate treatment in violation of the ADA, Plaintiff "must prove [1] that he had a disability within the meaning of the ADA, [2] that he was 'qualified' for the position with or without reasonable accommodation, and [3] that he suffered an adverse employment action because of his disability."  *Swanks v. Wash. Metro. Area Transit Auth.*, 179 F.3d 919, 934 (D.C. Cir. 1999) (internal citations omitted).  Even if Plaintiff had pleaded a separate disparate treatment claim, such a claim would fail for the same reasons Plaintiff's failure to accommodate claim fails: as will be discussed more fully below, Plaintiff utterly fails to provide the Court with any basis for concluding he was disabled within the meaning of the ADA, and thus he cannot make out a prima facie case for either violation of the ADA.

*Inc.*, 527 U.S. 471, 492 (1999) ("When the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs."). The only information available to the Court is Plaintiff's own testimony regarding his cancer and spinal stenosis, with no medical documentation, nor any specific facts regarding the nature of his impairment except for Plaintiff's self–stated diagnosis (cancer and spinal stenosis), that he had surgery, and that upon his return to work, lifting boxes would have been "inimical" to his health. *See* Def.'s Statement of Facts, Ex. B (Pl. Dep.) at 156:9–157:9. The only reference to any medical evidence is a doctor's note that Plaintiff claims he was required per APS policy to present before returning to work, but Defendant has stated that no such note is in Plaintiff's personnel file. Def.'s Statement of Facts, Ex. B (Pl. Dep.) at 158:12–161:4. Plaintiff does not recall what was contained in the doctor's note. *Id.* at 158:17–18.

In examining the EEOC factors as to whether someone is limited in a major life activity, as quoted in *Toyota*, Plaintiff similarly fails to establish any basis that would allow the Court to conclude he was disabled. The Court has no evidence as to the nature and severity of the impairment nor its duration or potential long–term impact, as Plaintiff has articulated no more than his diagnosis, which is itself unconfirmed by anything on the record.

Plaintiff could also bring himself within the statutory definition of disabled if he could show he was regarded as disabled by APS. 42 U.S.C. § 12102(2). As will be discussed more fully below, Plaintiff has not presented evidence that he put APS on notice of his disability, so there is no basis for concluding that APS regarded him as disabled. Thus, Plaintiff has failed to

provide evidence for his prima facie case for failure to accommodate, in that he has not presented evidence that he was disabled.

Plaintiff has presented no evidence that Defendant had notice of his disability – the second element of a failure to accommodate claim.  While Plaintiff's Opposition states that he "provided medical documentation to the Defendant and requested accommodation" from Defendant, Plaintiff's Answers to Defendant's Interrogatories state that Plaintiff "cannot recall" any of the communications he had with any APS employees regarding his health situation.  Pl.'s Opp'n ¶ 17; Def.'s Statement of Facts, Ex. D (Pl.'s Interrog. Answers) Nos. 11–12.  Plaintiff states that he discussed his cancer and spinal stenosis with Kraut and that his previous supervisor had approved his request to work from home, a decision that Brookhart allegedly overturned when she took over. Def.'s Statement of Facts, Ex. D (Pl.'s Interrog. Answers) No. 7.; Pl.'s Opp'n ¶ 17.  Again, Plaintiff's statements alone, with absolutely nothing on the record to substantiate his assertion that he provided APS with notice, are insufficient to survive summary judgment. *Hatsie*, 121 F. Supp. 2d at 81.  Further, even if the Court were to give credence to Plaintiff's statements standing alone, the only specific statement regarding this issue is that Plaintiff discussed his medical condition with Kraut in "early October," long after Plaintiff's old supervisor, who Plaintiff alleges approved the accommodation to work from home, left APS. Def.'s Statement of Facts, Ex. D (Pl.'s Interrog. Answers) No. 7.  Thus, based on the record before the Court, there is not sufficient evidence that Plaintiff put APS on notice of his disability such that they could have attempted to accommodate Plaintiff when the only specific reference to a conversation regarding Plaintiff's condition came long after the supervisor who allegedly

approved his working from home had left the company.  Plaintiff fails to fulfill the notice prong of his claim of failure to accommodate.

The third and fourth prongs are not met for the same reasons: with no evidence of the nature of Plaintiff's disability, the Court cannot assess whether Plaintiff would have been able to perform his job with reasonable accommodation; and with no record regarding any communications between Plaintiff and Defendant about his alleged disability, Plaintiff has not established that Defendant refused to accommodate Plaintiff's needs.

Although Plaintiff did not plead his being asked to move boxes shortly after his surgery as a separate basis for his failure to accommodate claim, the Court will address such a claim, given the references in the record to Plaintiff being required to "engage in activities that were inimical to [his] health and wellbeing."  Def.'s Statement of Facts, Ex. D (Pl.'s Interrog. Answers) No. 8.  Plaintiff alleges, following his surgery, that he was told not to lift anything heavy, but that materials he needed to complete his work were kept in boxes that needed to be pulled down.  Def.'s Statement of Facts, Ex. B (Pl. Dep.) at 156:5–157:3.  Plaintiff stated that he was told "you have to get the work done," but that he could ask another employee, Aqueel, to lift the boxes.  *Id.* at 157:3–9.  Aqueel refused to lift the boxes, which never were moved.  *Id.* at 157:10–18.

First, this incident as a basis for a failure to accommodate claim fails because Plaintiff still has not brought forth sufficient evidence that he is disabled within the meaning of the statutory language.  Regarding whether Plaintiff fulfilled the second element of his prima facie case, providing notice to APS of his disability, the Court notes that this incident occurred after Plaintiff's surgery, the period during which he alleges he should have been allowed to work from

home.  Def.'s Statement of Facts, Ex. B (Pl. Dep.) at 158:3–11.  Plaintiff's precise testimony is

that he "said now, look, I cannot lift these boxes at all."  The Court concludes that this statement,

alone, is not sufficient to consider APS on notice that Plaintiff was disabled, given that Plaintiff

does not claim he informed Defendant that he was disabled, but rather that he could not lift

boxes, which does not, in and of itself, make one disabled.  Further, his supervisor permitted

Plaintiff to ask someone else to lift the boxes, such that Plaintiff was in no way required to do so.

Finally, while Plaintiff states that the boxes were never moved, he has not alleged any negative

consequences of his not having access to the materials in the boxes, such that there is no basis for

concluding that his being unable to lift boxes precluded him from performing his job.  In sum,

Plaintiff simply telling his supervisor that he could not lift boxes does not suffice as notice of a

disability, when, on the record before the Court, APS had no reason to believe that Plaintiff had a

disability for which he needed accommodation in order to perform the duties of his position.

Thus, Plaintiff fails to provide any evidence on the record relating to any of the four

elements required to make a prima facie that Defendant failed to accommodate Plaintiff in

violation of the ADA.  The Court therefore grants summary judgment to Defendant on this claim

as well.

## IV:  CONCLUSION

Because there are issues in dispute that are material as to whether APS fit within the

statutory definition of "employer," the Court shall deny Defendant's motion for summary

judgment with respect to this issue.  The Court shall also deny Defendant's motion with respect

to Plaintiff's failure to establish compliance with administrative deadlines in his Complaint

because Rule 8 of the Federal Rules of Civil Procedure does not require a plaintiff to plead such

compliance in a complaint.  However, the Court has concluded that Plaintiff's Complaint was filed untimely according to the deadline set forth in his Right to Sue letter, and accordingly, the Court shall grant Defendant's motion for summary judgment on this basis.  Additionally, in the alternative, had Plaintiff's Complaint been timely filed, Defendant would still be entitled to summary judgment on the merits of Plaintiff's claims in their entirety.

For the aforementioned reasons, Defendant's [30] Motion for Summary Judgment is GRANTED on the basis of Plaintiff's failure to timely file his claims with the instant Court and on the merits with respect to all remaining claims.  The instant case is DISMISSED.  An Order accompanies this Memorandum Opinion.


Date:   July 27, 2006


_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge